Our second case for this morning is Midwest Operating Engineers Welfare Fund against Cleveland Quarry and associated cases. So anytime you're ready, Mr. Martone. Good morning. Good morning. I may have pleased the court. My name is Andy Martone. I'm counsel for the three employers in this case, Cleveland Quarry, Allied Stone, and Cordova Dredge. This is actually a consolidated appeal involving three separate decisions from three different district judges, Your Honor. Are these divisions of Riverstone or are they separately incorporated? Divisions of Riverstone, Your Honor. Your Honor, the district courts erred in holding that the employers were required to continue contributing to the health and welfare and pension funds based solely on the terms of three collective bargaining agreements that decertification rendered void as a matter of law. Now, Mr. Martone, Gerber Truck in Chile, hasn't our court concluded that an employer is obligated to make payments under Section 1145 unless such payments would be unlawful regardless of any defenses to the contract as a whole, including the defense that the union was decertified? In other words, isn't the decertification relevant only if the employer can assert that it would be unlawful to make such payments after decertification? I don't believe so, Your Honor. I believe that both Chile and Gerber Truck are not only distinguishable from this case but actually support our position in this case. With regard to the Chile decision, this court held that decertification is not a categorical or per se bar to a union's ability to collect pension and health and welfare payments due under the terms of a collective bargaining agreement. Chile was wholly based on the participation agreement, a separate side agreement, Your Honor. Why does the fact that it's on a separate piece of paper have such significance to you? Well, it has significance, Your Honor, because that separate piece of paper was not rendered void by operation of law. Well, see, we would have to agree with that proposition. I don't think that the CBA was void, either void ab initio. It ceased to govern the relationship between the employer and the employees through a union. That much is clear. But the word void is, I think, an extreme word to use. I believe that void is the correct term, Your Honor, under the Declawa decision. I don't think it's so sure. In this case, the collective bargaining agreements at issue were between the union and the employers. Sure, as they normally are. Absolutely, Your Honor, although in some cases there are associational agreements as well. So one of the arguments your opponents make is the following, that at the beginning of this particular collective bargaining agreement, which happened to be a five-year agreement, the funds are making actuarial plans. They think that there's a five-year stream of payments, both in the welfare benefit plan and the pension plan, that are going to be coming in. They can see that at the end of the five years of this, given the decertification, this relationship is over. They weren't planning on anything beyond five years. But I understand the funds to think that they have actual obligations to these employees under both the welfare plan and the pension plan out to the end of the five years because of the way the benefits law operates. So even though the employer isn't paying under the union and so on, the plans still have to pay. And so getting monies in makes a difference, too. Well, I think that that's incorrect for two reasons, Your Honor. The first reason I believe it's incorrect, because as a matter of law, and this is 26 U.S.C. section 411A4G, when employers are no longer obligated to contribute to the fund, the funds are no longer obligated to provide the benefits. Well, that just reposes the question, doesn't it? Because we're here to see if the employers are continuing throughout the end of this five-year contractual term. That's true, Your Honor. But what happens to the money? You say that the plan doesn't have to make any further disbursements to the workers. What happens to the money? Well, in terms of the money, Your Honor, if you're referring to the contributions that were made. Pardon? The contributions that were made prior to the decertification went to provide health and welfare benefits to the employees up to that point. Then the employers took over that obligation and enrolled the employees in the employers' own health and welfare plans. If Your Honor is referring to the pension payments, the pension payments went to invest the employees with pension rights under the funds. Now, I'm looking at this section of the collective bargaining agreement, which says the employer's responsibility to make contributions to the welfare plan shall terminate upon expiration of this agreement. But there's money in the plan, presumably, even though the employer is no longer making contributions. And I just wondered what happens to that money? Well, the money in the plan goes to cover benefits for all of the employees covered by the plan, not just the three employers at issue, Your Honor. And I believe that the funds position is incorrect. You're not answering my question. I'm sorry. What happens to the money that is in the plan? The money that's in the plan as far as the pension, Your Honor, went to pay for the vested benefits of the employees covered by the plan. They remain vested under law according to the vesting schedule. So, actually, that leads me to a related question. I am completely confused that nobody is talking about withdrawal liability in this case. Because it seems to me that if we were to follow your logic through to the end, then at the date that the decertification becomes effective, you have withdrawn from the multi-employer plan, and the plan would then assess withdrawal liability against you. Because it's well established that when there are these vested rights, one has to put the funds in the plan that will enable the plan to meet those vested rights. That's exactly correct, Your Honor. So have you received a request for withdrawal liability? We will not receive a request for withdrawal liability until this court determines when the employers withdrew. Okay, so it's really, in some level, it's just a debate. In some instances, it's over about four months, maybe up to a year. Did you withdraw on the date of decertification, or did you withdraw at the end of the five-year term of the CBA, which is what Judge Posner just referred to? Yes, Your Honor. And so we will receive assessments for withdrawal liability. The funds just have been unable to issue those assessments until this court sets the dates of the withdrawal. And so the funds will not be cut short in that regard. They will receive the withdrawal liability to which they're entitled. But it's not at all clear that your, I mean, it wouldn't be unheard of for employees to have two different sources of medical coverage, for example. That happens all the time, and then people argue about which one is primary and so forth. So your assumption is that this language that Judge Posner referred to refers to the decertification date, whereas the sort of straightforward way to read the contract might be the termination date means the termination dates specified in the contract. I believe that the termination date may mean the termination date specified in the contract, but I believe that decertification, a National Labor Relations Board process, makes the contract void, terminates the contract as a matter of law, Your Honor. Well, but, right, so that's again back to this debate. What it clearly does under our Gerber truck decisions, under lots of other circuits' decisions, is it ends the relationship between the employer and the union, and it ends the union's ability to serve in the workplace as the representative of the employees. But this is not a simple bilateral relationship, and we stressed in our other decisions that the funds are in a different position, and whatever happens over on this side may not carry over to the relationship between the funds and the employees for whose benefit they were created. And Gerber truck, Your Honor, basically stated that the funds are holders in due course of the collective bargaining agreement and instrument. But I think that Gerber truck also stands for the proposition that a holder in due course is bound by the language and takes no greater rights than the parties to the contract. But to the contract, not to the labor agreement, to the arrangement for benefits, pension welfare benefits. Well, but that is the contract, Your Honor. It's wholly subsumed in the contract. There's no separate obligation. Well, I beg to differ. The collective bargaining agreement is serving as the written agreement that supports the fund, but it isn't, no one's talking about how many hours you have to pay or how much vacation you're going to get or what kind of grievance procedure there's going to be or all the other things that collective bargaining agreements deal with. The fund, and under ERISA it has to be the case, is operating under a different set of laws. And that's true, Your Honor. But in this case, one of the central tenets of ERISA is we take contracts as we find them. I think that that's actually a connection to the second issue on appeal, which is under the plain language of the collective bargaining agreements, the employers were no longer obligated to contribute to the funds after decertification. That's true, but there's still a fund, isn't there? There's still a fund, Your Honor, but under the language... What's it being used for? It's being used to provide health and welfare benefits for employees whose employers are covered by the fund and pension benefits for employers whose employers are covered by the fund. So am I wrong if I think that what Gerber-Truck tells us is that employers must keep their promises to pension funds, regardless of defenses to the contractual obligation, such as we have here, the lack of majority support for the union? Am I wrong? Well, Your Honor, decertification is not the same thing. Am I wrong? I believe so, Your Honor. Even though that's what Gerber-Truck says. I think Judge Rover was quoting. I believe you're quoting the decision correctly, Your Honor. I apologize if it sounded different. But I believe that loss of majority status and decertification are different things. Loss of majority status is an affirmative defense, a fact-based affirmative defense that can be asserted by an employer. Decertification is a legal process undertaken by the employees and certified by a government agency, the National Labor Relations Board. There is no factual argument over decertification. There is no need to go into what happened in terms of decertification. That's a practical difference, to be sure, but it's not really a substantive difference. It's just a way of saying very clearly that there's no majority support for the union because there was a board-sponsored election. I believe it's a substantial legal difference, Your Honor, more than simply a difference in semantics.  Documents promising to make contributions on behalf of all employees, understandings and practices that would prevent enforcement of the writings between the employer and the union also defeat the fund's claims. That's from Gerber Truck at page 1148, Your Honors. In this case, decertification is neither an understanding nor a practice. Decertification is a legal process by operation of law. It is not initiated by an employer. It is not an affirmative defense to contract. What it is is it's a situation where the contract is rendered prospectively void as a matter of law. I think that also, if we're going to focus on contract language, the district courts were inconsistent in the way that they applied contract language. On one hand, they wanted to apply the termination of the contract as written, but on the other hand, they attempted to rewrite the contribution obligation. The language at issue... You're focusing under the terms of this agreement's language. Yes. I was just going to warn you that you may not be able to see it, but you're pushing into your rebuttal time. I'll be very quick about that point, and I can't see the light. I'm sorry, Your Honor. The language at issue reads, the employer shall make the following contributions for each hour for which an employer receives wages under the terms of this agreement. When the agreement's void, they're no longer receiving wages under the terms. In fact, the employer's paid them a different wage rate following decertification. In addition to that, the agreements define the terms employee to mean any employee covered by this agreement. At the point of decertification, there were no employees covered by this agreement. Gerber-Truck stands for the proposition that in ERISA cases, we take contracts as they are written, and that you can't use defenses to change the writing, essentially. That's United States Supreme Court law, and it's also this circuit's law. If the court accepts the district court's opinion, what will be happening is we will be essentially omitting those words, omitting the phrases under the terms of this agreement and covered by this agreement. We will be rewriting the collective bargaining agreements, and under ERISA, that's exactly opposite for the purpose, because ERISA stands for certainty of contributions with regard to what's written in the agreement. And so the district courts allowed the funds to have their cake and eat it, too. In this case, the district courts enforced the termination date as written, but refused to enforce the contribution obligation language as written. As a result, that was error, and the district courts should have done it. And then with regard to the illegality argument, Your Honor, I'll sum it up very briefly. I know that my time is running short. Under Section 186C5, the question before the court is... We're familiar with this argument, so maybe why don't you save the last minute for the rebuttal. In that case, Your Honor, I will save the rest of my rebuttal. I will assume that you have made it. Thank you. Mr. Pearson. Good morning, Your Honors. Counsel, may it please the Court. My name is Dale Pearson. I represent the Midwest Operating Engineers Welfare and Pension Funds, together the funds. The funds are... Mr. Pearson, I just want to ask a bottom-line question. Under your interpretation of 1145, it's the only available defense that the payments would be unlawful. In what circumstances, in other words, would the decertification of the union impact the analysis? I don't believe any circumstances, Your Honor, under this Court's decisions in Gerber Truck in Chile. I believe the decertification, it's very clear, is not a defense to the obligation to contribute. The Court says that repeatedly in Gerber Truck. The Court does describe it in terms of the loss of majority status, but I think it's important to remember that decertification, the election process that the National Labor Relations Board administers, is one way to determine whether a union has lost majority support. But that's only one of the mechanisms, and it was the mechanism that was applied here. But the cases say over and over, Gerber Truck at least three times says, that the loss of majority support is not a defense to the obligation to contribute. But what sense does that make? I guess the part of the argument that I would like you to focus on, if you would, for a minute, is the argument that Mr. Martone was discussing toward the end of his presentation, namely the language of this CBA. Because if you were to read Gerber Truck in Chile, it's not quite the absolute statements that you're talking about, but really saying in these particular arrangements, we don't see any reason for that change to make a difference, but maybe there could be other agreements with other provisions. This CBA says that the employers are obliged to contribute on behalf of employees who are receiving wages under the terms of the agreement. So how do we understand that phrase, employees that were receiving wages under the terms of the agreement? The district courts thought that was just a way of talking about the employees of these employers, but it's a needlessly complicated way to say that. After decertification, their wages are not determined by the CBA anymore, right? The amount, yes, Your Honor, and the employer would be free to pay whatever he wants. The amount, the other terms, how many hours, how long do you need to wash up before lunch, none of that. Correct. However, because the court has made it clear that the analogy is to a holder in due course, the funds get to rely on that contract as written. So the employees... Which contract? The collective bargaining agreement, which in turn also adopts the trust agreement. That's the one that says that the employer's responsibility to make contributions to the welfare plan shall terminate upon expiration of the collective bargaining agreement. Correct, Your Honor. That's why it continued until, for the full five-year term. But it doesn't assume, again, I mean, actually I'm having the same problem with both sides, the answer to the question that's before us, because if you take the position that one of the events that can cause the termination of the collective bargaining agreement is, in fact, the decertification of a union pursuant to an election supervised by the board, that happened, and it happened after the three-year contract bar was over, as it had to, but before the full five years for each of these three agreements, slightly differing times, but let's just say sort of on the average a year out. So if that's what termination of the agreement means, then the employer's obligation under the CBA itself that you're relying on ends with the decertification, maybe with notice of the decertification. I don't really care which date that one. If termination of the agreement just means what does it say in the agreement without regard to any external event, then maybe you're right, but I need some reason to give such little weight to decertification. It doesn't mean that's part of our dispute, Renter. It does not mean that the contract terminated upon decertification of the union. I don't understand. How can you have a collective bargaining agreement or any agreement with only one party? A collective bargaining agreement is an agreement between the union and the company. If the union disappears, then there's no agreement. There's an agreement between the employer and the trust funds as the holder in due course, perhaps as a third-party beneficiary because there's a promise in the collective bargaining agreement and the trust agreements to make contributions to the trust funds in order to pay benefits. But this Section 3 of the collective bargaining agreement says that the responsibility to make contributions ends when the agreement expires. When it expires. Yes, but how can you have an agreement continuing after there's only one party left? It's not an agreement. It's not that there's only one party left, Your Honor. The law is that upon decertification, the union can't enforce it. That's what the case law says. Of course. The union no longer has any – there's nothing it can do under the collective bargaining agreement. Correct. The union – Then in what sense is there still an agreement? I can have an agreement with only one party. The trust funds, Your Honor, are separate legal entities. And as Taft-Hartley trust funds, they are administered jointly by trustees, half of whom are appointed by the union, half by the – What point do you give to this Section 3? What's your understanding of Section 3? The expiration section, Your Honor? Yeah. That it expired in May of 2015 and contributions were owed to the trust funds up until that point. How can a collective bargaining agreement continue after one of the parties disappears? Because as a matter of law, it does not terminate. It does not terminate the agreement. As a holder in due course, the funds are allowed to rely on those writings. That's what Herbert Crockett Shilley says. So you're saying the funds can kind of jump over the union and go straight to the employer, even though the union has fallen out of the picture? Yes, Your Honor. Shilley says that. The trust funds have greater rights than the union has under the collective bargaining agreement. If we were not to agree with you, would the funds be sending withdrawal notices based on the dates of the decertification? If that's the ruling of this court, yes, Your Honor. Okay. So you've not done anything to prejudice your right to do that. We'll decide how we decide. I have no idea, but that's what would happen. I think that's right because it's two sides of the same coin. The contribution obligation ends and the withdrawal liability obligation begins at the same point. So do you think the employer had to continue making contributions after the decertification? It did, yes, Your Honor. But, of course, it says it doesn't. It says it has to make contributions until the contract expires in May of 2015. That's what we enforced in the district court's decisions below. It doesn't say anything about the date in which the contract expires. Well, the contract was in effect until— I'm having trouble with the notion of a contract which has only one party to it. Your Honor, I'm sorry, but, again, there isn't just one party. Yes, there's no union in it. Right, but the trust— So who's the other party? The trust funds. The trust fund is not a party to collective bargaining. Well, the trust agreements are adopted by the contract, and the contract itself requires the employer to make contributions to the trust funds. Again, separate legal entities that are administered jointly by employers and union trustees. They have rights under that agreement that they can enforce until expiration. That's what Gerber-Trux says. That's what Shilley says. So it's really the trust fund agreements that are actually the continuing agreements, and there is a provision in the collective bargaining agreement that is incorporated into the trust fund agreement that you're trying to persuade us is active somehow, that continues the employer's obligation for this extra year or so. It's both, Your Honor, because the cases, a careful reading of the cases, shows that the contract did not terminate, was not voided. The case that's cited by opposing counsel in oral argument, this DECLA decision, you have to keep in mind DECLA is a construction industry case under AF of the Labor Act. That's not what these contracts are. So the concept that you could void an agreement through an election only applies in a construction context under Section 8F of the Labor Act. These are straight-up majority status contracts that were started, well, actually decades ago. The union established a majority, negotiated five-year agreements consecutively for many years, at least since the 90s. Now, your opponent suggests that there are actually some material distinctions between your situation with a board decertification and both Gerber and Schillie, that there was a separate participation agreement, for example. So I could easily imagine if there was a separate side agreement, maybe it would continue, even if the underlying CBA ceased to have force. I don't think there's substance to that, Your Honor. The participation agreement and the contract that were involved in Schillie were essentially the same thing. The court even says it's two different ways of creating the same obligation. I don't understand that, because what the court said in Schillie was Schillie contends that although the decertification voided the 1994 CBA, the terms of the participation agreement made clear the truck transport's obligation to survive that event, which is fine. But certainly the implication is that only the participation agreement enabled the company's obligations to survive. Your Honor, I think the treatment of the court in the Allied Stone case is instructive here. If you read both Schillie and that treatment, the decertification basically ended the union's ability to enforce either document, either the participation agreement or the collective bargaining agreement. There's really no difference between those obligations. The fact that there was a separate document really is irrelevant to the analysis. Decert meant that the union couldn't enforce it because the union had lost its majority support. The trust funds can, as holders in due course, because that loss of majority support is not a defense. So you say the participation agreement was irrelevant in Schillie? Yes. Well, the court didn't think it was irrelevant. You think it's irrelevant. The court didn't think so. Well, the court did say that the decertification meant that the union couldn't enforce either agreement. It wasn't relevant because the obligation to contribute arose under either one, under either the contract or the participation agreement. But that's not really what's involved here. We've got here a contract that requires the employer to make contributions of trust funds. So could you say a word about the argument that you made that when the CBA, let's just take it as a five-year event, I realize it was a history, but the CBA establishes a five-year contract. I understood you to be arguing that at the beginning of that, the fund trustees sit down, supposedly, and figure out what do the contributions need to be for that full five-year term. This is not something they revisit every year. I'm just trying to figure out what's your reliance interest on this being five years as opposed to three years or four years. Well, I think the explanation in Gerber-Truck, Your Honor, is spot on about how trust funds in this context, multi-employer funds operate. The documents, the collective bargaining agreement is tendered to the funds. The funds then make projections based on an assumption that they're going to collect contributions for the five-year term. A lot of it is more immediate. The welfare fund is a shorter-term calculation, but you're still relying on contributions for five years because you're going to pay benefits for two of these employees past the time of the decertification. If they're eligible, they're going to make claims, which they did. It's not in this record. Yeah, so under these terms, even after the decertification, the fund regards itself as still under, let's say, the welfare plan obligated out to the end of the CBA to pay, say, medical claims that people submit? Absolutely. Pay medical claims and then even more dramatically pay pension fund benefits that can project off of decades. Okay, so there's double dipping for the employees in this situation since they also got put under the employer's plan. That is correct. And by law, Your Honor, certainly with respect to the pension and then also under the plan terms here, welfare, employees are entitled to get credit for hours worked. So these employees who are no longer being represented by the union are still getting pension credits and health and welfare credits. And I want to emphasize- Out to the end of the five-year term. To the end of the expiration of the agreement, yes, Your Honor. And like I say, that's under ERISA and under the plan terms. So the obligation to pay these benefits, again, pension is the most dramatic 20 years from now. They're making calculations today based on assumptions that include those contributions. Okay. Your time is up. So thank you very much. Thank you, Your Honor. And Mr. Martone, I think you managed to save about a minute, so I'll round up. First point, Your Honors, is that there's no basis in the record for the fund's assertion that the fund has continued to accrue any types of benefits for these employees. In fact, under ERISA, if the employer was not obligated to contribute, they don't owe the employees benefits. My second point is a holder in due course is entitled only to enforce the language of the instrument as written. There's no argument in this case that the trust agreement obligated the employers in due course in this case to contribute. The only argument is based on the collective bargaining agreement. In this case, the collective bargaining agreement defines not only a duration, but it also specifically defines for whom the contributions are owed. In this case, Your Honor, contributions are only owed for employees working under the terms of a collective bargaining agreement. The construction context is irrelevant. De-certification renders a collective bargaining agreement prospectively void, Your Honors, whether it's in construction or not. It's the same law, the same concept. In construction, you can sign a pre-hire agreement, but that's it. This Court's decision, I believe, actually this Court, I'm sorry, the citation is lost to me, Your Honors, but this Court has decided that a contract being void is a valid defense to an ERISA collection action. In other words, it's not just illegality. A void contract is not the source of a contribution obligation. Now, this Court used the term void ab initio, void from the beginning, but that distinction is not relevant in this context because we're only talking about prospective contributions and not contributions from the beginning. Okay. Thank you very much. Thanks to both counsel. We'll take the case under advisement.